ORIGINAL

FILED
MAR 9 2004
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| JOHN E. MCCAFFERTY, D/B/A CLASSIC CATERING, PLAINTIFF, | ) | NO. 03-2292C |
| V. | ) | (JUDGE BRADEN) |
| THE UNITED STATES, DEFENDANT, | ) | |

**AFFIDAVIT OF JOHN E. MCCAFFERTY**

Commonwealth of Massachusetts
County of Middlesex

I, John E. McCafferty, being duly sworn, do hereby depose and say:

1. I am a citizen of the Commonwealth of Massachusetts with a residential address of 67 Whitney Avenue, Lowell, Middlesex County, Massachusetts.

2. I am the Plaintiff in the above entitled action.

3. I formerly operated a food service business known as Classic Catering. The business address for Classic Catering was 67 Whitney Avenue, Lowell, MA.

4. I formerly operated Classic Catering on the United States Army Installation known as Devens Reserve Forces Training Area ("Devens RFTA") located at Devens, Massachusetts.

5. This is the former site of the military installation known as Fort Devens.

6. Classic Catering provided meals to military personnel, primary Guard and Reserve, that were training at Devens RFTA.

7. Classic Catering also operated the Minuteman Tavern ("Minuteman") on the Devens

RFTA..

8. Minuteman Tavern was located Building 623, 42 Givry Street, Devens RFTA, Devens, Massachusetts, which was located at property controlled by the Devens RFTA..

9. The Minuteman Tavern was operated primarily as: a restaurant serving military and civilian personnel meals on a daily basis; providing a facility for functions, meetings and banquets; and, providing a bar which served alcoholic beverages, light meals and provided games.

10. During the time that I operated on the Devens RFTA, the Devens RFTA essentially provided a facility and training areas for the training of personnel of the United States Army Reserve, Army National Guard and other military services.

11. Most of the training of the Reserve and Guard components was their monthly weekend drill assemblies.

12. During the times in question, Devens RFTA was operated by a small Headquarters force of United States Army active duty personnel and United States Army and Department of Defense ("DoD") civilian personnel which operated and maintained the actual Devens RFTA facilities and provided logistical support for the training military personnel.

13. On or about October 1, 1999, the I and the Devens RFTA Contracting ("Devens Contracting"), a department within the Devens RFTA Headquarters garrison, entered into a one (1) year Contract for the purposes of my being awarded a concession to operate a food and beverage facility within the Devens RFTA for the benefit of the Devens RFTA full-time personnel as well as the military personnel training there ("Contract"). This was the Minuteman Tavern. A copy of the contract was attached as Exhibit "A" to the Complaint previously filed.

14. On or about December 6, 2000, the I, on behalf of Classic Catering and Devens Contracting executed a Modification of the Contract. The primary modification was that the original contract was extended termination date was extended from October 1, 2000 until September 30, 2004. A copy of the Modification was attached to the previously filed Complaint as Exhibit "B".

15. It was through this Contract that I was granted a license for concession services and was allowed to operate the restaurant, function facility and bar known as the Minuteman Tavern.

16. As such, I and Devens RFTA entered into a lease for the building that has been identified as Building 623 where the Minuteman Tavern was located. A copy of the Lease was attached as Exhibit "C" to the previously filed Complaint.

17. In return for providing certain food and beverage services to the personnel of the Devens RFTA, as well as its supported units and military personnel, I was required to pay a negotiated percent of my gross income to Devens RFTA.

18. My point of contact for the operation of the Minuteman Tavern facility as a restaurant, function facility and tavern was the Devens RFTA Contracting Officer ("Devens CO").

19. The Devens RFTA contracting officer was ultimately under the supervision of the Commanding Officer of the Devens RFTA, an active duty United States Army Officer, normally a Lieutenant-Colonel ("LTC")(O-5).

20. Additionally, I also provided food service support and catering services to military personnel, primarily United States Army Reserve ("USAR") or Army National Guard ("ARNG") personnel training there during drill weekends ("IDT") and active duty training periods ("AT" or

"ADT").

21. My point of contact for the contracting for the providing of meals for these personnel during these training periods was the Devens RFTA Installation Services Officer ("ISO").

22. The ISO was also ultimately under the supervision of the Commanding Officer of the Devens RFTA.

23. Initially, I had an excellent relationship with both points of contact as well with the personnel on the Devens RFTA and USAR and ARNG units that came to train at Devens RFTA.

24. I would contract with the Devens CO for the operation of the basic restaurant, proving food and beverage to functions, meetings and events at the Minuteman was well as well the sponsoring unit/department.

25. I would contract solely with the ISO for the providing of meals in the Minuteman Tavern for drilling reservists or guardsmen. I would also contract with the Iso for the providing of meals for drilling reservists and guardsmen at other mess facilities that were maintained by the Devens RFTA for use by military units during training periods.

26. To the best of my knowledge funding and payment for the catering and providing of meals for drill reservists or guardsmen came through what was called appropriated funds.

27. I submitted all bills for payment for these services to drilling reservists and guardsmen through the ISO.

28. The Minuteman Tavern was subject to periodic food service inspections by the Food Service/Medical Personnel on a periodic basis to insure an acceptable level of cleanliness and sanitation.

29. Pursuant to my contract with the Devens CO, I was required to maintain the

Minuteman Tavern facilities in "broom-clean" condition. The responsibility for other maintenance and repairs the Division of Public Works department of the Devens RFTA.

30. On 23 February 2001, I was contracted by the ISO to provides meals for drilling reservists during the period of 4-24 March 2001. A copy of the Memorandum regarding same is attached as Exhibit "A". These meals were to be provided to a specific unit, namely 11/98th HS/PN (a medical unit).

31. The rate for these meals, per person, was negotiated between the ISO and myself, namely $6.00, $8.00 and $8.00 for breakfast, lunch and dinner. The price varies depending upon what sort of menu is requested.

32. During part of that same time period as well as into early April, 2001, I contracted to provide meals to military personnel of the 7th Bn (OD), 98th Regt. A copy of that Memorandum is attached as Exhibit "B".

33. As a result of these contracts I ordered additional foods, scheduled additional food servers and cooks to work and declined other contracts.

34. All of these meals were to be prepared and served at the Minuteman Tavern.

35. On Friday afternoon, March 2, 2001, the Devens RFTA Commanding Officer, LTC John M. Otto, visited the Minuteman Tavern.

36. Based upon information and belief, I do not believe that LTC Otto has either a food service or medical corps background.

37. LTC Otto complained upon the condition of the floors, complaining that they were scuffed, marked, and unsatisfactory. He ordered that I was not allowed to feed any personnel in the facility until the floors could be redone.

38. LTC Otto was not accompanied by any food service or medical sanitation inspectors and because of the lateness of the hour and day, no food service and/or medical sanitation personnel were available to inspect the floors.

39. I had just recently prior to this weekend had my entire facility inspected and satisfactorily pass, a copy of the inspection is attached as Exhibit "C".

40. The problem with the floors was not related to the cleanliness of them but their condition. A condition that was under the purview of the Devens RFTA DPW and not me.

41. I had previously complained to the Devens RFTA DRW about the condition of the floors but had received no response.

42. I was not provided with any documentation to reflect that my food service facility had been closed down, just the verbal order from the Commanding Officer.

43. As a result of same I tried to contact the ISO but she was not available. I therefore had to notify the units that I was scheduled to feed that I could not feed them and they had to scramble to find alternative sources of food service.

44. Since I didn't know how long I would be closed I had to advise units that I was scheduled to feed the following weekend that I might not be able to feed them and that they should seek alternative sources, which they did.

45. As a result of same, the contracts with both units were cancelled for the entire period as the units sought other sources of food service for the entire period of their contracts due to the uncertainty of my situation and their need to plan ahead and lock in commitments, which I could understand.

46. As such, I lost the benefit of two significant food services contracts for more than one

and one-half (1 ½) months.

47. The issue with the floors was ultimately corrected. I was never issued any unsatisfactory inspection by the food service/medical sanitation inspectors nor was I ever advised by any food service or medical sanitation personnel that the floors were unsatisfactory and required the closing of the food service facility.

48. I submitted bills to the ISO for my lost meals due to the unjustified actions of Commanding Officer, attached Exhibits "D". But I was denied payment for my losses. reasons for same. Further, there has never been a Food Service and/or Medical inspection of the mess facility to substantiate the allegations regarding the condition of the floors by the US Army or that they were the fault of the Plaintiff.

49. As part of my contract with the Contracting Officer, the Tavern used to operate seven (7) days a week and provided food, beverage, both alcoholic and non-alcoholic, and music to the personnel of the Devens RFTA, Reservists, National Guardsmen, and other individuals.

50. The Contract and the Lease, which incorporates the Contract, initially provided that access to the facilities of P-623, to include the Tavern, were limited to: (1) All Federal civilian employees working at the DRFTA; (2) All uniformed (military) personnel; (3) Dependents and/or guests of military or civilian personnel; and, (4) individuals possessing a DOD identification card, Active, Reserve and retired and authorized dependents, see Paragraph C-12 of the Contract, Exhibit "A" of the Complaint.

51. From 2001 through February, 2002, the Devens RFTA Chain of Command had been aware of the shrinking base of authorized personnel who could use the facilities of P-623. Further, there had been discussions between military and civilian employees of the Devens

RFTA and the myself regarding same and a need to insure that I could financially afford to maintain its operation.

52. During the same time period, and in fact since the beginning of the contract, various Commanding Officers of the Devens RFTA used to utilize the Minuteman Tavern to host a number of functions to which the general public was invited. Among the Commanding Officers that did that were LTC Gracus Dunn and LTC John Otto.

53. These functions would be either scheduled directly with the host entity or through the Contracting Officer. Depending on the source/sponsor of the event would determine who I would bill for both the use of the facility as well as well as for any food or beverage services provided. To the best of my knowledge the sources of these funds were different than the sources of the funds for the catering to military personnel on training exercises and/or drill weekends.

54. Further, the Commanding Officers used to allow non military functions to utilize Building 623 and the Minuteman Tavern.

55. As recently as March, 2002, LTC Dunn authorized that a flea market, whose primary clientele were civilians, to be run out of Building 623.

56. As a result of the concern regarding my being able to maintain the facility successfully if I was limited to only allow the personnel listed in the contract to utilize my leased facilities at Building 623, there were a series of verbal understandings/agreements between the Chain of Command of Devens RFTA and myself, whereby the I could seek to expand my customer base to maintain the Minuteman Tavern's financial viability.

57. This included significant advertising in the surrounding communities to attract the public to solicit and patronize the Tavern. This include both radio and print advertising as well

as the booking of bands to attract the general public.

58. This also provided a more entertaining and attractive setting/environment for the military personnel to patronize, especially during weekends. Due to the expenditures of significant monies by me, I started to increase my customer base and improve the financial viability in the operation of the Tavern.

59. The Tavern also provided a safe and secure environment within which both the Devens RFTA military personnel and the general public could enjoy themselves and minimize the risk of alcohol related incidents of military personnel if they were forced to travel off post on weekends to visit clubs and bars. Normally, most drilling reservists and guardsmen who trained at the Devens RFTA, especially for weekend drills, if they stayed overnight, were normally off-duty after 4-5 p.m. each evening. After Fort Devens closed and the Devens RFTA was established there were very few, if any, on-post facilities that provided either food or beverage service, especially in the evening hours.

60. I am aware that both LTC Dunn and LTC Otto supported this concept and thought it was a great idea both in providing the entertainment and the fact that it kept the military personnel, especially on weekend nights, within the military environs.

61. I relied upon the statements of the Commanding Officers as well as the communications with the other staff of the Devens RFTA in expending a significant amount of monies to upgrade the entertainment of the Tavern.

62. I believed that I was providing a significant service to both the Chain of Command of the military installation as well as to the military personnel who utilized the military installation, and that all parties benefitted from these actions.

63. In fact, LTC Otto attended a comedy show that I sponsored at the Tavern one weekend evening that showcased the "Bud Girls". As a result of the show we had quite a number of military personnel and civilians attend the show instead of leaving the military installation and it was a great success.

64. LTC Otto told me that it was a great show and he really liked it.

65. Without warning on or about 4 February 2002, I was informed by the Commander Officer of Devens RFTA, LTC Otto, that he was going to reinstate the restricted access provision of the Contract to the Tavern, see attached Exhibit "E".

66. This determination was made despite the fact that the Commander conceded in said letter that both he and "prior commanders" had allowed this expansion of the customer base authorized to patronize the Tavern.

67. LTC Otto did this despite the fact that he either knew or should have known that the I had expended significant amounts of money, time and energy to build up the customer base patronizing the Tavern, especially since he had himself attended one of the main events.

68. Further, on or about 14 February 2002, I was informed by LTC Otto, that he was going to revert to the restricted access provisions of the Contract immediately.

69. This immediate restriction was allegedly based upon a recent incident involving two teenagers who were allegedly stopped on the Devens Business Park streets (but not inside the Devens RFTA military area) and found to have alcohol and marijuana in their possession. Although there were no allegations that the two teenagers had been served at the Tavern, they allegedly made representations, although not contained in the official police report, that there were allowed into the premises.

70. It was ultimately determined that the teenagers allegations were false and I was exonerated. Further, it had always been reported by law enforcement officials that I had always maintained a very strict process for the inspection and review of the age of customers before they are admitted to the Tavern. There had never been any previous complaint regarding the serving of underage individuals in the Tavern in almost two years.

71. This immediate and significant restriction on my customer base was devastating to my business. Especially after "9/11" the normal on-post customer base had shrunk dramatically and this new restriction was financially fatal to my ability to operate the Minuteman Tavern.

72. What was especially galling to me was the selective enforcement of access restriction to P-623 after the notice was given to me.

73. Despite the fact that since 22 February 2002, access to the facilities of PP-623 operated by me, to include the Tavern, had been restricted to personnel as outlined in paragraph C-12 of the Contract per the order of the Commanding Officer, and despite the fact the Devens RFTA Provost Marshal's Office had posted signs on the building regarding same, the Commanding Officer allowed a civilian organization to use P-623 for a flea market during a weekend in March, 2002 as previously stated. The majority of the customers to said flea market were non-DOD personnel who would have not been authorized to use the facilities for an event sponsored like me, but which were authorized to use the facilities for an event sponsored by someone else. The ultimate indignity was that the civilian event sponsors and were even provided their own keys to open and close the building that I was leasing and responsible for!

74. I have demanded that the Defendant fulfill its obligations under the contract and make me whole for its arbitrary and capricious actions in suddenly restricting access but the defendant

has failed and refused to reimburse me for my losses and continues to fail and refuse to do so.

Subscribed and sworn to under the pains and penalties of perjury this 18th day of February, 2004.

John E. McCafferty, d/b/a
Classic Catering

# EXHIBIT "A"

FRC-FAD-DLS (ISO)

23 Feb 2001

MEMORANDUM FOR CLASSIC CATERING, John McCafferty

SUBJECT: Catered Meals 4-24 March 2001, Change 1

Reference Contracted Catered Meal Service

Per our discussion, will need meals provided for the 11/98th HS/PN as follows:

| | Break (0630-0730) | Lunch (1200-1300) | Dinner (1700-1800) |
|---|---|---|---|
| 4 Mar | 0 | 30 | 50 |
| 5 | 50 | 50 | 50 |
| 6 | 50 | 50 | 50 |
| 7 | 50 | 50 | 50 |
| 8 | 50 | 50 | 50 |
| 9 | 50 | 50 | 50 |
| 10 | 70 | 70 | 70 |
| 11 | 70 | 70 | 50 |
| 12 | 50 | 50 | 50 |
| 13 | 50 | 50 | 50 |
| 14 | 50 | 50 | 50 |
| 15 | 50 | 50 | 50 |
| 16 | 50 | 50 | 50 |
| 17 | 50 | 60 | 50 |
| 18 | 50 | 60 | 50 |
| 19 | 50 | 50 | 50 |
| 20 | 50 | 50 | 50 |
| 21 | 50 | 50 | 50 |
| 22 | 50 | 50 | 50 |
| 23 | 50 | 50 | 50 |
| 24 | 30 | 0 | 0 |
| | 1020 | 1040 | 1020 |

Break 6120.00
Lunch 8320.00
Dinner 8160.00
Total 22600.00

3. Meals will be consumed at your establishment, Village Green, bldg 623.

4. Numbers for this commitment are subject to change. If so you will be notified immediately.

5. POC is the undersigned, (978) 796-3074/3899

2/27/01 11:57 AM

//Debbi K. Charboneau//
DEBBI K. CHARBONEAU
Installation Services Officer (ISO)

# EXHIBIT "B"

7th Bn (OD), 98th Regt

March – April 2001 Schedule

John,

I have requested meals for our AT from 21 March – 8 April through Debbie Charbonough. I have also added our unit drill dates to this list. Again, we appreciate your service and wish to give you first opportunity for these meals. **Please circle the meals that you can not provide.**

| Date | | # | Meals | | |
|---|---|---|---|---|---|
| 17 Mar – Sat | DRILL (call ahead) | 22 | | Lunch | |
| | DRILL | 08 | | | Dinner |
| 18 Mar – Sun | DRILL (call ahead) | 22 | | Lunch | |
| 21 Mar - Wed | | 06 | | Lunch | Dinner |
| 22 Mar - Thurs | | 06 | Breakfast | Lunch | Dinner |
| 23 Mar - Fri | | 06 | Breakfast | | |
| | | 30 | | Lunch | Dinner |
| 24 Mar – Sat | | 30 | Breakfast | Lunch | Dinner |
| 25 Mar – Sun | | 30 | Breakfast | Lunch | Dinner |
| 26 Mar – Mon | | 30 | Breakfast | Lunch | Dinner |
| 27 Mar – Tues | | 30 | Breakfast | Lunch | Dinner |
| 28 Mar – Wed | | 30 | Breakfast | Lunch | Dinner |
| 29 Mar – Thur | | 30 | Breakfast | Lunch | Dinner |
| 30 Mar – Fri | | 30 | Breakfast | Lunch | Dinner |
| 31 Mar – Sat | | 30 | Breakfast | Lunch | Dinner |
| 01 Apr – Sun | | 30 | Breakfast | Lunch | Dinner |
| 02 Apr – Mon | | 30 | Breakfast | Lunch | Dinner |
| 03 Apr – Tues | | 30 | Breakfast | Lunch | Dinner |
| 04 Apr – Wed | | 30 | Breakfast | Lunch | Dinner |
| 05 Apr – Thur | | 30 | Breakfast | Lunch | Dinner |
| 06 Apr – Fri | | 30 | Breakfast | Lunch | Dinner |
| 07 Apr – Sat | | 30 | Breakfast | Lunch | Dinner |
| | DRILL (call ahead) | 12 | | Lunch | |
| 08 Apr – Sun | | 30 | Breakfast | | |
| | DRILL (call ahead) | 17 | | Lunch | |

Thanks

Dianna

# EXHIBIT "C"

# 'REHENSIVE FOOD SERVICE INSPE

For use of this form, see TB MED 530, the proponent agency is the Office of The Surgeon General.

| INSTALLATION | BUILDING NO. | FACILITY DESIGNATION |
|---|---|---|
| Devens Reserve Forces Area Tray | Bldg 623 | Village Green (Classic Catering) |

| PERSON IN CHARGE OF FACILITY | COPY REPORT FURNISHED TO |
|---|---|
| John McCafferty | Same |

**TYPE FACILITY** (1)
- [ ] 1. Troop Dining Facility
- [ ] 2. Cafeteria
- [x] 3. Snack Bar
- [ ] 4. Hospital Dining Facility
- [ ] 5. Club
- [ ] 6. Other *(specify)*

**RATING** (2)
- [x] 1. Satisfactory
- [ ] 2. Unsatisfactory
- [ ] 3. Marginal
- [ ] 4. Other *(specify)*

**PURPOSE** (3)
- [x] 1. Regular
- [ ] 2. Courtesy
- [ ] 3. Reinspection
- [ ] 4. Other *(specify)*

| COMMAND (4-5) | INSTALLATION (6-9) | FACILITY (10-12) | INSPECTOR (13-15) | INSPECTION TIME (MIN) (16-18) | DATE YR (19-20) | MO (21-22) | DAY (23-24) | RESERVED (25-34) |
|---|---|---|---|---|---|---|---|---|
| N A | — | — | — | 0 6 0 | 0 1 | 0 1 | 1 6 | — |

| DESCRIPTION | WT |
|---|---|
| **FOOD** | |
| *01 Approved source, sound condition, no evidence of spoilage | 5 |
| 02 Original container, properly labeled | 1 |
| **FOOD PROTECTION** | |
| *03 Potentially hazardous food meets time/temperature requirements during storage, preparation, display, service, transport; leftover policy | 5 |
| *04 Equipment to maintain product temperatures | 4 |
| 05 Thermometers provided, conspicuous, accurate | 1 |
| *06 Proper tempering/thawing of potentially hazardous food | 3 |
| *07 Potentially hazardous food offered for self service not re-served | 2 |
| 08 Food protected during storage, preparation display, service transport | 2 |
| 09 Handling of food/ice minimized | 2 |
| 10 In use, food/ice utensils properly stored | 1 |
| **PERSONNEL** | |
| 11 Training program records available | 1 |
| *12 No evidence of communicable diseases, skin infections, cuts, burns | 5 |
| *13 Hands washed and clean, good hygiene practices | 4 |
| 14 Clean work garments: hair restraints; no unauthorized jewelry, watches | 1 |
| **FOOD EQUIPMENT AND UTENSILS** | |
| *15 Food/ice contact surfaces are nontoxic, properly designed, constructed, installed, located, and maintained | 3 |
| 16 Nonfood contact surfaces properly designed, constructed, installed, located, and maintained | 1 |
| 17 Utensil washing facility properly designed, operated, maintained, and installed | 2 |
| 18 Accurate thermometers, pressure gauges, chemical test kits provided/used | 2 |
| 19 Utensils preflushed, scraped, soaked | 1 |
| **FOOD EQUIPMENT AND UTENSILS** *(con't)* | |
| 20 Wash, rinse water: Clean, proper temperature | 2 |
| *21 Sanitization rinse: clean, correct temperature, concentration, exposure time, and pressure. Equipment/utensils sanitized. | 4 |
| 22 Wiping cloths: Clean, restricted in use, stored in sanitizing solution | 1 |
| *23 Food contact surfaces of equipment and utensils: clean, sanitized between uses, free of abrasives/detergents | 3 |
| (24) Nonfood contact surfaces of equipment and utensils clean | 1 |
| 25 Proper storage, handling of clean, sanitized equipment and utensils | 1 |
| 26 Single-service items: not reused, properly stored, and dispensed | 2 |
| **WATER** | |
| *27 Safe approved sources, adequate hot and cold water, adequate pressure | 4 |
| **SEWAGE** | |
| *28 Adequate sewage and liquid waste disposal | 4 |
| **PLUMBING** | |
| 29 Installed, maintained properly | 1 |
| *30 No cross-connection, potential back siphonage, backflow | 3 |
| **TOILET AND LAVATORY FACILITIES** | |
| 31 Adequate number, convenient, accessible, designed and installed properly | 3 |
| 32 Toilet rooms enclosed, self-closing doors, good repair, adequate hand cleaner, running water, temperature, hand drying facilities, waste receptacles | 1 |
| **GARBAGE AND REFUSE DISPOSAL** | |
| 33 Containers or receptacles covered, adequate number, vermin proof, emptied frequently, clean | 3 |
| **GARBAGE AND REFUSE DISPOSAL** *(con't)* | |
| 34 Outside storage area properly constructed, clean; adequate container washing facilities | 1 |
| **INSECT, RODENT, OTHER ANIMAL CONTROL** | |
| *35 No evidence of insects/rodents - unauthorized animals | 4 |
| **FLOORS, WALLS, AND CEILINGS** | |
| 36 Floors: constructed, drained properly, in good repair; covering installation durable, dustless cleaning methods | 1 |
| (37) Walls, ceilings, attached equipment constructed properly, good repair, surfaces clean, dustless cleaning methods | 1 |
| **LIGHTING** | |
| 38 Lighting adequate, fixtures shielded, protected | 1 |
| **VENTILATION** | |
| 39 Rooms vented as required | 1 |
| *40 Filters and grease extracting equipment clean and properly installed | 4 |
| **DRESSING ROOMS/AREAS** | |
| 41 Clean, lockers provided, convenient location, used | 1 |
| **OTHER OPERATIONS** | |
| *42 Necessary toxic items properly stored, labeled, used | 4 |
| 43 Premises: Maintained free of litter, unnecessary articles - maintenance equipment properly stored, authorized personnel only | 1 |
| 44 Clean/soiled linen properly stored | 1 |
| 45 Complete separation of food operations from living/sleeping quarters, laundry | 1 |
| (46) Other *(specify)* | |

**FOLLOW-UP**
- [ ] 47 Yes
- [x] 48 No

RATING SCORE IF USED — not used
49 *(100)* Less weight of items violated

*Critical deficiencies requiring immediate correction - Use DA Form 5161-1 for additional remarks.

| SIGNATURE OF INSPECTOR | TIME | DATE |
|---|---|---|
| Tommy L. Gann, WO1 (signature) | 13:15 | 1/16/01 |

| SIGNATURE OF RECEIVER | DATE |
|---|---|
| (signature) | |

DA FORM 5161, AUG 91

USAPA V1.00

# FOOD SERVICE SANITATION INSPECTION - REMARKS FORM

For use of this form, see TB MED 530; the proponent agency is OTSG

Form will be attached to and become a permanent part of either DA Form 5161 or DA Form 5162.

| FACILITY | DATE | INSPECTOR |
|---|---|---|
| DRITA The Village Green Bldg 6023 | 1/16/01 | WO1 Tammy Carri |

## 1. REMARKS

#24 Equipment shelves, walls, floors, need a general cleaning

#37 Racks used to hold clean and sanitized utensils have dust & debris. Recommend a thorough cleaning. Ice machine outside should be cleaned.

#46 Terminix pest control needs to replace traps that have sprung. Recommend using Ketch-alls or covered sticky traps. These would last longer than spring traps.

## 2. DATA

**A. Refrigerator Temperature**

| UNIT | °F |
|---|---|
| Sandwich frige | 37°F |
| Cold Holding | 40°F |
| Walk-in | 38°F |
| | |

| B. Dishwashing Data | °F |
|---|---|
| (1) Manual (a) Sanitizing Temp. | 180°F |
| (b) Chemical Type | — |
| (c) Conc. *(ppm)* | — |
| (2) Mechanical (a) Wash Cycle Temp. | 162°F |
| (b) Rinse Cycle Temp. | 180°F |
| (c) Final Cycle Temp. | 200°F |
| (d) Chemical Conc. *(ppm)* | — |

**C. Heated Food Temperature**

| UNIT | °F |
|---|---|
| Clam chowder | 160°F |
| Soup on stove | boiling |
| Shepard's Pie on stove | 140°F |
| Chili Sauce | 170°F |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

**D. Freezer Temperature**

| UNIT | °F |
|---|---|
| Walk-in | -10°F |
| | |
| | |
| | |
| | |
| | |

# EXHIBIT "D"

April 5,2001

Dear Sir,
Attached are copies of contracts my company was hired for.

As I understand I'm the tenant at Bldg. 623 and the government is my landlord.

On Friday March 2,2001 I was informed by my landlord that I was not allowed to feed soldiers in my facility because the floors were not satisfactory. The army medical group has inspected me, and the floors were never an issue with them. I personally have had conversations with DPW & DOL about the floors and there care. Because no one took charge of the issue my company suffered a great loss. Not just my company but also my employees who look forward to the overtime for extra income for themselves & family.

The following amounts are what I am requesting in compensation:

Invoice # 572 in the amount of $22600.00

Compensation amount $15300.00

Invoice # 573 in the amount of $10957.05

Compensation amount $5478.00

Total amount $20778.00

Respectfully request that this letter be responded to with payment in full no later than close of business day April 10, 2001.

Respectfully,
John E. McCafferty
Classic Catering

Classic Catering
Catering For All Occasions
67 WHITNEY AVE.
LOWELL, MA 01850
OFFICE (978) 452-7845
FAX (978) 452-8927

# Invoice

| DATE | INVOICE # |
|---|---|
| 3/19/01 | 572 |

**BILL TO:**

U.S.ARMY

| P.O. NUMBER | TERMS | PROJECT |
|---|---|---|
| | Due on receipt | |

| QUANTITY | DESCRIPTION | RATE | AMOUNT |
|---|---|---|---|
| 1,020 | breakfast | 6.00 | 6,120.00 |
| 1,040 | lunch | 8.00 | 8,320.00 |
| 1,020 | dinner | 8.00 | 8,160.00 |
| | A copy of the contract that my company was given is attached | | |

We appreciate your prompt payment.

**TOTAL** $22,600.00

794 (10/98)

Classic Catering
Catering For All Occasions
67 WHITNEY AVE.
LOWELL, MA 01850
OFFICE (978) 452-7845
FAX (978) 452-8927

# Invoice

| DATE | INVOICE # |
|---|---|
| 3/19/01 | 573 |

**BILL TO:**

U.S.ARMY

| P.O. NUMBER | TERMS | PROJECT |
|---|---|---|
| | Due on receipt | |

| QUANTITY | DESCRIPTION | RATE | AMOUNT |
|---|---|---|---|
| 480 | breakfast | 5.95 | 2,856.00 |
| 531 | lunch | 7.95 | 4,221.45 |
| 488 | dinner | 7.95 | 3,879.60 |
| | this s a contract that my company lost because of the situation with the floors at bldg.623 | | |
| | copy attached | | |

We appreciate your prompt payment.

**TOTAL** $10,957.05

# EXHIBIT "E"

DEPARTMENT OF THE ARMY
DEVENS RESERVE FORCES TRAINING AREA
DEVENS, MASSACHUSETTS
01432-4424

REPLY TO
ATTENTION OF:

February 4, 2002

Office of the Commander

John E. McCafferty
The Minuteman Tavern, Bldg. 623
Devens, Massachusetts 01432

Dear John,

As part of my follow-up to various discussions we have had relative to the operation of the Minuteman Tavern (the "tavern"), I have received an opinion from my Legal Advisor that Army regulations prohibit the patronage of "civilians" at facilities such as the tavern, except with limited and restrictive exception. Although our contract with you indeed recognizes this prohibition, at paragraph C-12, by limiting patronage to Department of Defense (DOD) employees and, if applicable, their guests, I accept the fact that previous commanders and I have allowed the gradual patronage "creep" to the current levels of unauthorized patronage. Unfortunately, I can no longer accept patronage at the tavern by other than personnel as authorized by our contract.

I realize this will create a hardship for you. I am prepared to entertain suggestions from you for a modification of your contract with the Civilian Welfare Fund in order that you might still be able to provide some level of service to the soldiers of this community. I believe it is entirely appropriate to revisit the level of commission paid, hours and periods of operation, and extent of service. I cannot, however, waiver from the requirement that only DOD employees and, if applicable, accompanying guests patronage the facility after a date to be determined.

While I would prefer that you comply with the patronage provisions of the contract immediately, I realize such might create an economic hardship on you. Accordingly, I ask that you schedule a time for us to meet within the week when we can discuss a timetable for compliance.

Sincerely,

John M. Otto
Lieutenant Colonel, U.S. Army
Commander